IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KENSINGTON COMMUNITY, : <br> CORPORATION FOR INDIVIDUAL : <br> DIGNITY, : <br>      Plaintiff : <br> : <br> v.   : <br> : <br> NATIONAL UNION OF HOSPITAL : <br> AND HEALTH CARE EMPLOYEES, : <br> DISTRICT 1199C : <br>      Defendant : <br> : | CIVIL ACTION NO. 15-2942 |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                       **June 28, 2016**

Plaintiff Kensington Community Corporation for Individual Dignity ("KenCCID") filed this action against Defendant District 1199C, National Union of Hospital and Health Care Employees, AFSCME, AFL-CIO ("the Union"), seeking to vacate an arbitration award ordering reinstatement of a bargaining unit employee. The Union filed a separate action seeking to enforce the arbitrator's award.[1] The cases have been consolidated and the parties have filed cross-motions for summary judgment.[2]

### I.     FACTUAL AND PROCEDURAL HISTORY[3]

On December 26, 2013, a residential counselor at KenCCID was suspended without pay pending an investigation of alleged psychological abuse of a patient.[4] According to KenCCID's Certified Investigation Report, another employee alleged that the residential counselor "treated

---

[1] Case No. 15-3233.

[2] Case No. 15-3233, Doc. No. 4.

[3] Except as noted, the following facts are undisputed.

[4] Joint Record at 106.

and spoke to [patient R.L.] in a disrespectful and inappropriate manner to the point that he became very upset."[5] KenCCID and the Pennsylvania Department of Public Welfare (DPW) investigated the allegation. KenCCID concluded that "there is no evidence to conclude that [the employee] psychologically abused R.L.," but found that the employee committed neglect because she did not assist her co-worker with R.L, including with transferring him in and out of his wheelchair.[6] The DPW found:

> "Staff A was advised by Staff B and observed Staff C not working to assist Individual #1 and was dismissive toward Individual #2. Staff B also confirmed in a witness statement and interview that Staff C did not attend the individuals required needs on 12/22/13. Staff reported that Staff C did not assist with the required 2:1 transfer of Individual #1 to and from a wheelchair."[7]

KenCCID and the DPW concluded that the employee (Staff C) violated § 6400.33(a) of the Pennsylvania Code, which states that individuals with mental retardation in community homes "may not be neglected, abused, mistreated or subjected to corporal punishment."[8] KenCCID also concluded that the employee violated its Employment Accountability Policies, which prohibit employees from committing "physical or emotional abuse of any individual, inclusive of verbal assaults, denial of food, clothing and/or personal safety, and violation of Individual rights."[9]

As a result of the investigations, KenCCID terminated the employee on February 5, 2014.[10] The termination letter stated that on December 22, 2013, the employee was "observed by the supervisor during your shift of not working to assist individual R.L. and dismissive towards

---

[5] Joint Record at 179.

[6] *Id.*

[7] It is unclear from the record before the Court what evidence the DPW obtained other than a witness statement from and interview with the complaining employee, in the course of its investigation.

[8] 55 Pa. Code § 6400.33(a).

[9] Joint Record at 199.

[10] *Id.* at 105.

individual J.D…It was also reported that you did not adhere to the Individual Support Plan (ISP) of individual R.L. by not assisting with the required 2:1 transfer to and from a wheelchair."[11]

Pursuant to the parties' collective bargaining agreement,[12] the Union filed a grievance to dispute the termination.[13] KenCCID denied the grievance because "these violations involved neglect of an individual by being dismissive towards individual J.D. and not attending to the individual's required needs" and "neglect warrants immediate termination of employment."[14] The grievance was then referred to arbitration and hearings were held before an arbitrator on December 11, 2014 and March 6, 2015.

In KenCCID's post-hearing brief to the arbitrator, it argued that the employee was discharged for cause because she neglected patient R.L. by failing to "provide the two to one assistance…that was required," despite being trained on his needs, because she was "rude and dismissive" toward patient J.D., and because she "spent her time sleeping, reading her witchcraft book, talking on the phone, and otherwise completely disregarding her job."[15] KenCCID argued that discharge was a reasonable penalty because the asserted actions compromised the residents' health and safety and exposed KenCCID to liability.[16] KenCCID also argued that it was required to submit a correction plan to DPW to address the violation, and in establishing this plan, it had to follow its own policies and procedures, which require termination for a violation of individual rights.[17]

---

[11] *Id.*

[12] *Id.* at 87-88.

[13] *Id.* at 107. If a grievance is not resolved, the collective bargaining agreement provides that it may be "referred for arbitration by the Union." *Id.* at 88.

[14] *Id.* at 108.

[15] Joint Record at 31.

[16] *Id.* at 32.

[17] *Id.* at 37-38.

The Union argued that KenCCID failed to present credible evidence that the employee knew she was required to assist her coworker in transferring R.L. into and out of his wheelchair, and that there was no evidence that R.L.'s ISP required 2:1 care on the date at issue.[18] The Union also argued that KenCCID failed to establish that DPW regulations required termination, as KenCCID did not present any document published by the state to support what the Union described as the incredible testimony of its executive director.[19]

After reviewing the parties' arguments and making credibility findings in a fifteen-page decision, the arbitrator found that KenCCID did not have just cause to terminate the employee. He first determined that the employee was not "informed of the need for 2:1 transfers of RL" and credited her testimony that she believed only that "two staff had to be *present* with RL due to his condition."[20] As a result, the arbitrator concluded that the employee did not neglect R.L. "or any other resident on December 22, 2013 in the sense that a critical need of any resident was purposely unanswered" by her.[21] The arbitrator did find that the employee "failed to pull [her] weight with co-workers in the assistance of residents," but concluded that this did not constitute neglect under Pennsylvania law or KenCCID's policies.[22] Instead, the arbitrator held that the employee violated KenCCID's Performance Duty Rule One, which prohibits employees from refusing to perform duties, and that the three day suspension prescribed by KenCCID's policies for such a violation was the appropriate discipline.[23] The arbitrator therefore ordered that

---

[18] *Id.* at 51.

[19] *Id.* at 53.

[20] *Id.* at 13.

[21] Joint Record at 13.

[22] *Id.*

[23] *Id.*

KenCCID change the "termination to a three-day suspension and make her whole for loss of all back pay, benefits, and seniority she lost during her separation from employment."[24]

KenCCID argues that the arbitrator's award should be vacated because it violates public policy and because the award exceeded the arbitrator's authority under the collective bargaining agreement. The Union argues that the award should be enforced because it draws its essence from the collective bargaining agreement.

## II.   LEGAL STANDARD

Summary judgment is appropriate if "the materials in the record" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[25] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[26] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[27] In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[28] Further, a court may not "weigh the evidence or make credibility determinations."[29] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[30] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[31] This requirement upholds the "underlying purpose of summary

---

[24] *Id.* at 15.

[25] Fed. R. Civ. P. 56(a), (c)(1).

[26] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[27] *Id.*

[28] *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[29] *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[30] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[31] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[32] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[33]

### III. DISCUSSION

Judicial review of labor arbitration awards is limited.[34] "In reviewing an arbitration award, courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts."[35] This is because, by choosing to include an arbitration clause in a collective bargaining agreement, the parties "choose to have disputes concerning constructions of the contract resolved by an arbitrator."[36] Courts therefore may not review the merits of an arbitration award, even if the parties allege that the arbitrator made factual errors or misinterpreted the contract.[37] Instead, "[a]s long as the arbitrator's award draws its essence from the collective bargaining agreement, and is not merely [the arbitrator's] own brand of industrial justice, the award is legitimate."[38] There is, however, a narrow exception that allows courts to vacate an arbitration award where the award violates public policy.[39]

---

[32] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976)).

[33] *Celotex*, 477 U.S. at 322; *Wisniewski v. Johns–Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[34] *Citgo Asphalt Ref. Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Local No. 2-991*, 385 F.3d 809, 815-16 (3d Cir. 2004).

[35] *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) (internal citations and quotation marks ommitted).

[36] *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 764 (1983).

[37] *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

[38] *Id.* (internal citations) (quotation marks omitted).

[39] *Service Employees Int'l Union Local 36 v. City Cleaning Co., Inc.,* 982 F.2d 89, 92 (3d Cir. 1992).

### A.     Whether the Arbitrator's Award Violates Public Policy

Courts may only vacate arbitration awards on public policy grounds where an arbitrator interprets the collective bargaining agreement in a manner that explicitly conflicts with a "well-defined, dominant public policy" that is "ascertained from law and legal precedent."[40] If an employer establishes such a public policy, the Court must then "determine whether the arbitrator's award, as reflected in his interpretation of the agreement, violated that policy."[41] In making this determination, however, the Court must not "second-guess[] the arbitrator's fact-finding," especially where concluding that the award violates public policy requires the Court to draw factual inferences that were not made by the arbitrator.[42]

KenCCID argues that there is a well-established public policy in favor of protecting individuals from abuse and neglect by their caregivers, which Pennsylvania has codified in a variety of statutes and regulations, and that the arbitrator's award violates this public policy because it reinstates a caregiver who neglected residents. For the purposes of this motion, the Court has no difficulty in assuming that such a public policy exists.

After considering all of the evidence, including the DPW finding of a violation of § 6400.33(a) of the Pennsylvania Code, the arbitrator explicitly found that the employee did *not* neglect residents on the day in question and in the manner described. Instead, the arbitrator determined that the employee was unaware of R.L.'s alleged need for 2:1 assistance, and that it had not been demonstrated that she failed to address the critical needs of any residents, although she apparently failed to perform some duties, warranting a three day suspension. As the Court is required to defer to the arbitrator's factual findings, and because the arbitrator found that the

---

[40] *Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436, 1441 (3d Cir. 1992).

[41] *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993).

[42] *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 839 F.2d 146, 148 (3d Cir. 1988).

7

employee did not neglect residents R.L. and J.D. on the day in question, her reinstatement does not violate any public policy requiring the protection of individuals from neglect.[43] The especially deferential nature of the Court's review in this context is highlighted by the Third Circuit's decision in *Nat'l Ass'n of Letter Carriers*.[44] There, the Third Circuit confirmed an arbitrator's award which found that a postal service employee, who had shot bullets into his supervisor's car, "showed no proclivity to further aggression."[45] The Court of Appeals therefore held that the award reinstating the employee did not violate an alleged public policy against permitting an employee to direct physical violence against a superior.[46] KenCCID's argument is an attempt to re-litigate the merits of its claim that it had just cause to terminate because of neglect. While the Court agrees that allegations of neglect are extremely serious, and that neglect is untenable in any institutional setting, especially where, as is the case here, workers are employed to assist vulnerable residents with their physical and emotional care, there is nothing in the record to suggest that the arbitrator failed to take KenCCID's claims seriously. As there is

---

[43] *SEIU Healthcare Mich. v. Outer Drive Partners, LLC*, No. 08-13757, 2009 WL 1803237, at *6 (E.D. Mich. June 19, 2009) (holding that the court was bound by the arbitrator's finding that the employee did not commit the neglect for which she was discharged, and thus that the arbitration award reinstating her would not violate a public policy of ensuring that nursing homes do not employ staff who neglect residents); *Maggio v. Local 1199*, 702 F. Supp. 989, 996 (E.D.N.Y.), *aff'd*, 880 F.2d 1319 (2d Cir. 1989) (holding that public policy of protecting residents of health care facilities from being subjected to physical abuse was not violated where the arbitrator found that the employee did not intentionally abuse patients); *Chippewa Cty. War Mem'l Hosp. v. Michigan Nurses Ass'n*, No. 2:11-CV-00010-TPG, 2011 WL 3924313, at *5 (W.D. Mich. Sept. 7, 2011) (rejecting employer's claim that arbitration award violated public policy because the employee intentionally refused to assist in restraining and secluding a patient, neglected a patient, and therefore failed to provide safe nursing care, because the arbitrator found that the employee did assist her supervisor and that her actions were in the best interest of the patient).

[44] *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 839 F.2d 146 (3d Cir. 1988).

[45] *See Nat'l Ass'n of Letter Carriers*, 839 F.2d at 149-50 (assuming that there was a public policy against permitting an employee to direct physical violence against a superior, but finding that the alleged public policy was not violated where the arbitrator found that the employee, who had shot bullets into his supervisor's car, "showed no proclivity to further aggression" at the time he was reinstated);

[46] *Id.*

support in the record for the arbitrator's decision, the Court may not reconsider the merits of the award, even if the arbitrator erred in his factual finding.[47]

KenCCID next contends that the award violates public policy because enforcement of the award will force it to violate the law, as it claims it was required by DPW to terminate the employee. KenCCID argues that after DPW found neglect, DPW required KenCCID to submit "an acceptable plan of correction…in order to continue to operate"[48] and that DPW regulations state that the agency "may deny refuse to renew or revoke a certificate of compliance for….failure to comply with the acceptable plan to correct noncompliance items."[49] As its employer policies require that employees be terminated for violations of individual rights, KenCCID argues, DPW would only consider its plan acceptable if the employee were terminated.

The Court first notes that KenCCID's policies do not require termination for every violation of individual rights—the policies state that "[g]reater or lesser penalties than those indicated may be imposed, giving due consideration to the particular circumstances involved."[50] Additionally, KenCCID does not provide any legal authority for its claim that DPW would not have found the plan acceptable without the employee's termination. The letter from DPW requiring KenCCID to submit the corrective plan stated only that the plan must include: "what specific change will be made, who will make the change, when will the change be made, how will the change be made, what system have you implemented to make sure that the same

---

[47] *Misco, Inc.,* 484 U.S. at 36; *D.A. Nolt, Inc. v. Local Union No. 30*, 143 F. Supp. 3d 229, 229 (E.D. Pa. 2015) ("A labor arbitration decision fails to draw its essence from the collective bargaining agreement if the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination.").

[48] Joint Record at 188.

[49] 55 Pa. Code § 20.71.

[50] *Id.* at 199.

violation will not occur again and what training will be provided to your staff" and that DPW was "available to…assist you in the development of an acceptable plan."[51]

Moreover, no corrective plan is in the record and there is no basis for concluding that KenCCID submitted a plan that required termination, that DPW accepted this plan, or that such a plan is currently in place, and thus there is no evidence that KenCCID would be in violation of a corrective plan if it reinstated the employee. Such unsupported allegations are insufficient to defeat or support a motion for summary judgment.[52] If KenCCID did choose to submit such a plan while the grievance process was still pending,[53] it did so accepting the risk that its corrective plan and the arbitration decision could lead to different, binding requirements.[54] The alleged dilemma that KenCCID now claims it faces is thus "of the Company's own making" by having "committed itself voluntarily to two conflicting [] obligations" and therefore "it cannot argue now that liability under the collective bargaining agreement violates public policy."[55]

---

[51] *Id.*

[52] *See Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000) ("At summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.").

[53] The arbitrator found that Union instituted the grievance on or about December 26, 2013, Joint Record at 2, and the letter from DPW requiring KenCCID to submit a corrective plan was dated January 9, 2014, Joint Record at 188. KenCCID does not dispute these dates.

[54] KenCCID could have instead proposed a different corrective plan, or, in the bargaining process, negotiated a collective bargaining agreement that gave it the "exclusive, nonarbitrable right to discharge an employee that it finds. . ." or that the state finds has committed neglect. *MidMichigan Reg'l Med. Ctr.--Clare v. Prof'l Employees Div. of Local 79, Serv. Employee Int'l Union, AFL-CIO*, 183 F.3d 497, 505-06 (6th Cir. 1999).

[55] *W.R. Grace & Co.*, 461 U.S. at 767-70. KenCCID also argues that enforcement of the award violates public policy because it exposes KenCCID to liability for negligently retaining an employee who has been found to neglect the individuals in her care. However, "in negotiating a CBA, an employer must weigh potential liability costs, vicarious or direct, against the other costs and benefits of the bargain" and as discussed above, as KenCCID could have negotiated around this potential. *MidMichigan Reg'l Med. Ctr.--Clare*, 183 F.3d at 505-06 (6th Cir. 1999). Moreover, even if, under some circumstances, an arbitration award that exposes one party to potential future liability may violate public policy, the possibility of liability here is extremely remote, and thus, there is no explicit conflict with well-defined public policy. Future liability would require the employee to engage in neglect, and in finding that she did not engage in neglect and should be reinstated, the arbitrator must have concluded that she is not a danger to the individuals in her care.

B.   **Whether the Arbitrator's Award Draws its Essence from the Collective Bargaining Agreement**

As the arbitration award does not violate public policy, the Court will now determine whether the award draws its essence from the collective bargaining agreement. If it does, it must be enforced. "An arbitration award draws its essence from the bargaining agreement if the interpretation can in *any rational way* be derived from the agreement."[56] Even that "a court is convinced that [the arbitrator] committed serious error does not suffice to overturn his decision" as long as the arbitrator "is even arguably construing or applying the contract."[57] This is because "both employer and union have granted to the arbitrator the authority to interpret the meaning of their contract's language" and thus "have 'bargained for' the 'arbitrator's construction' of their agreement."[58]

The arbitrator found that the collective bargaining agreement requires just cause before discharge, and that KenCCID failed to establish that it had just cause to discharge the employee. The Union argues that this determination draws its essence from the collective bargaining agreement because the seniority section of the collective bargaining agreement, which the arbitrator relied on, requires cause to break seniority.[59] In *Dauphin Precision Tool v. United Steelworkers of America*, the Third Circuit held that an arbitrator's interpretation of the collective bargaining agreement requiring an employer to have just cause before discharging an employee, drew its essence from the agreement, which stated there must be just cause before loss of

---

[56] *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) (internal citations and quotation marks omitted).

[57] *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 61-62 (2000) (internal citations and quotation marks omitted).

[58] *Id.* (citing *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599 (1960)).

[59] Joint Record at 9. The Court notes that KenCCID argued in its post-hearing brief that it had just cause to discharge the employee, and did not argue that the agreement does not require just cause.

seniority or employment.[60] Although the Court of Appeals was "troubled by the idea that a company which has given repeated warnings to a chronically absent employee finds itself being told that it cannot terminate that employee without providing some further notice—and it is not clear what sort of additional notice would satisfy the Union and the arbitrator," it confirmed the arbitrator's award.[61]

Thus, even if the Court is troubled by the arbitrator's decision, the arbitrator's conclusion that the collective bargaining agreement requires just cause can be rationally interpreted to stem from (1) the collective bargaining agreement's seniority provision, which requires cause before loss of seniority, (2) the agreement's management rights clause, which allows the employer to "discipline or discharge for cause," and (3) its probation section, which allows the employer to discharge probationary employees for any reason.[62] In reaching his conclusion, the arbitrator also properly relied on an award by another arbitrator who concluded that the agreement required just cause before discharge.[63] Moreover, as the Third Circuit has held that the term "cause" in a collective bargaining agreement is ambiguous and that "it is within the province of the arbitrator to interpret" ambiguous terms, the arbitrator's interpretation of the term "cause" to mean "just cause" is "not a ground for vacating [the arbitrator's] decision."[64]

---

[60] 338 F. App'x 219, 223 (3d Cir. 2009).

[61] *Id.*

[62] Joint Record at 8, 14, 34. *SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94, Local Lodge 311*, 103 F.3d 923, 925 (9th Cir. 1996) (confirming arbitration award where arbitrator determined that the collective bargaining agreement required just cause where seniority provision of the agreement stated that employees lose their seniority when dismissed for cause); *Smith v. Kerrville Bus Co.*, 709 F.2d 914, 917 (5th Cir. 1983) ("In instances where the language of a collective contract does not explicitly prohibit dismissal except for just cause, arbitrators typically infer such prohibitions from seniority clauses or grievance and arbitration procedures.").

[63] *Giant Eagle, Inc. v. United Food & Commercial Workers Union Local 23*, 547 F. App'x 106, 109 (3d Cir. 2013) ("Because the arbitrator's finding of ambiguity was rational, he was authorized to look to outside sources to decipher the parties' intent.").

[64] *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1295-96 (3d Cir. 1996). *See also Mobil Oil Corp. v. Indep. Oil Workers Union*, 679 F.2d 299, 303 (3d Cir. 1982) (confirming arbitrator's award where arbitrator interpreted a provision in the collective bargaining agreement which required cause before discharge to mean

KenCCID also contends that the arbitrator exceeded his authority because, under the management rights clause of the agreement, it has the exclusive right to discipline and discharge employees, and its decision must be upheld unless the discipline or discharge is arbitrary or capricious.[65] The Supreme Court has stated that courts "should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement," which is exactly what KenCCID argues the Court should do here.[66] As nothing in the agreement, including the management rights clause, explicitly restricts the arbitrator's authority to review whether there was cause for discharge, even if KenCCID's interpretation of the agreement "would make more sense, or …[if the Court] would reach a different result if reviewing this case *de novo*, the Arbitrator's reading is logical."[67] The Court therefore holds that the decision by the arbitrator that he had authority to determine whether KenCCID had cause to discharge, and his finding that KenCCID did not have cause draws its essence from the collective bargaining agreement and must be enforced.

---

objective cause, and thus considered whether the "discharge was justified in light of all the circumstances relevant to the employee's job performance, rather than only those factors known to [the employer] at the time."); *Suburban Transit Corp.*, 51 F.3d at 380-81 (confirming arbitrator's award where arbitrator interpreted "proper cause" as requiring progressive discipline, as the phrase proper cause was ambiguous); *Children's Hosp. of Buffalo v. Buffalo & W. N.Y. Hosp. & Nursing Home Council, AFL-CIO*, 582 F. Supp. 1147, 1153 (W.D.N.Y. 1984) ("The arbitrator's application of a 'just cause' standard rather than a 'cause' standard is clearly reasonable in view of the vague and ambiguous nature of the contract.").

[65] The language of the management rights clause that KenCCID claims supports its interpretation of the collective bargaining agreement states: "Except where expressly abridged by a specific provision of this Agreement, the Employer retains the sole right to hire, discipline or discharge for cause . . . to promulgate working rules and regulations . . . and to carry out the ordinary and customary functions of management, whether or not possessed or exercised by the Employer prior to the execution of this Agreement. However, such rights shall not be exercised in an arbitrary or capricious manner." Joint Record at 103.

[66] *Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 584-85 (1960).

[67] *Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs*, 357 F.3d 272, 288 (3d Cir. 2004). *See also Warrior & Gulf Nav. Co.*, 363 U.S. at 584-85 ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.").

## IV. CONCLUSION

For the reasons provided, this Court will grant the Union's Motion for Summary Judgment and deny KenCCID's Motion for Summary Judgment. An appropriate Order will be entered.